Charles H. Thronson
**Parsons Behle & Latimer**
201 South Main Street, Ste. 1800
Salt Lake City, Utah 84111
Tel: 801-532-1234
CThronson@parsonbehle.com

William B. Federman (*pro hac vice forthcoming)*
Jessica A. Wilkes (*pro hac vice* forthcoming)
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Avenue
The Village, OK 73120
Tel: (405) 235-1560
wbf@federmanlaw.com
jaw@federmanlaw.com

Nicholas Andrew Hall (*pro hac vice forthcoming)*
**Hall Attorneys, PC**
P.O. Box 1370
Edna, Texas 77957
Telephone: (713) 428-8967
nhall@hallattorneys.com

*Attorneys for Plaintiff and the Proposed Teacher/Educator Track Classes*

**THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

| | |
|---|---|
| FARAH L. VALLERA, individually and on behalf of the proposed Teacher/Educator Track Class<br><br>*Plaintiff,*<br><br>v.<br><br>INSTRUCTURE, INC.<br><br>*Defendant.* | Case No.<br><br>**TEACHER/EDUCATOR TRACK CLASS ACTION COMPLAINT**<br><br>**Separate Teacher/Educator Track**<br><br>JURY TRIAL DEMANDED |

Plaintiff Farah L. Vallera ("Plaintiff"), individually and on behalf of the Teacher/Educator Track Classes defined below, brings this Teacher/Educator Track Class Action Complaint in the

consolidated litigation captioned *In re Instructure Data Breach Litigation*, No. 2:26-cv-00374-RJS-CMR (D. Utah), as a separate direct-account-holder track against Defendant Instructure, Inc. ("Instructure" or "Defendant").[1] This pleading concerns the May 2026 security incident, the permanent shutdown of Canvas Free-for-Teacher ("FFT"), and the resulting deprivation of access to identifiable course content that professional educators personally owned or had the immediate right to possess. Plaintiff alleges the following based on personal knowledge as to her own acts and experiences and, as to matters within Instructure's exclusive knowledge, on information and belief after reasonable investigation by counsel.

## I. NATURE OF THE ACTION

1. This action arises from Instructure's operation of FFT, two related security intrusions, the permanent discontinuation of FFT, an initial approximately 48-hour recovery window announced through passive channels without individualized notice to every direct account holder, the ensuing denial of access after demand, and a second and purportedly final two-day access window announced on July 10, 2026, with support functionality disabled.

2. For professional educators, FFT was both a teaching infrastructure and a repository of substantial labor and intellectual capital. Educators used FFT to create account-linked course shells, lesson sequences, assessments, quiz banks, slide decks, rubrics, training modules, HTML layouts, discussion prompts, feedback libraries, files, and other reusable assets developed over

[1] The Teacher/Educator Track brings claims and alleges injuries which are separate and distinct from the student-privacy claims and institutional contract claims in that the Teacher/Educator Track claims arise out of a direct relationship between the teacher/educator and Instructure and seek recompense for FFT account holders whose right to their work product stored on Canvas has been hindered, interfere with, or thwarted due to Instructure's conduct.

months or years. Adjuncts, independent contractors, tutors, consultants, trainers, and curriculum developers personally own those assets and received no employer reimbursement for rebuilding or migrating them.

3. After the data breaches, Defendant took FFT offline without warning and has decided to keep the FFT platform offline indefinitely aside from two very brief windows. As recompense to the many teachers and educators who used the platform to create and building their courses, Defendant offered a one-time 48-hour window for individuals to log in to the FFT platform and download their information. Defendant did not send individual notice to the teachers and educators with FFT accounts – despite having the information and ability to do so. Defendant has announced that it plans to open another 48-hour window for FFT users to log in and download their information again at the end of July. However, Defendant, again, has failed to provide FFT users with direct and adequate notice of this final opportunity. Defendant also claims that it will not be offering any support during the 48-hour to ensure that teachers and educators are able to download and regain access to their property.

4. The property at issue is not an abstract teaching idea or a generalized copyright interest. It consists of specific electronic files, uploaded attachments, course packages, course identifiers, database records, module structures, assessments, metadata, and other account-linked digital assets that Instructure stored, controlled, and made exportable through FFT.

5. The Teacher/Educator Track is materially distinct from student-privacy claims and institutional contract claims. It is limited to direct FFT account holders who personally owned or had an immediate possessory right in identifiable course content and who suffered direct, non-

duplicative loss of use, recovery costs, rebuild or migration costs, substitute-platform expenses, or professional or business interruption.

6. The loss of use began when FFT was taken offline and continued after the initial May 28-29 recovery period. A later opportunity to export may mitigate future harm, but it does not erase the completed period of deprivation, the time and money already spent attempting recovery, or the risk that a final unsupported two-day window will not yield a complete and usable export.

7. Defendant failed to adequately protect its cybernetwork to prevent the data breach and protect the information, and FFT user's access thereto, stored on its system. Its response to the data breach compounded injuries. Not only did Defendant fail to adequately protect its system and test for vulnerabilities, Defendant also failed to timely detect *both* breaches. In response to the multiple breaches, Defendant scrambled to fix issues it did not understand. Defendant failed to timely and properly investigate the data breaches to determine how to properly and effectively disable the threat actors' unauthorized access and remedy the issues.

8. Defendant improperly disabled Canvas FFT and user's access to all of their stored information.

9. Defendant failed to properly and timely notify Plaintiff and the Class Members that it was disabling Canvas FFT and failed to properly and timely notify Plaintiff and the Class Members of their ability to download their property from the Canvas platform.

10. Defendant failed to properly and timely return to Plaintiff and the Class Members their property stored on Canvas.

11. This Track excludes schools, districts, colleges, universities, and employers seeking enterprise-contract remedies, service credits, institutional payroll or productivity losses, or IT and cybersecurity costs. It also excludes claims based solely on employer-owned content or fully compensated work time.

12. Plaintiff seeks only losses that she and Class members personally sustained. She does not seek damages belonging solely to an employer, educational institution, or separate business entity absent a valid assignment or the joinder of that entity.

13. Plaintiff Farah L. Vallera is an instructional designer, curriculum writer, educational researcher, faculty member, and Founder and CEO of Mindful Learning Design, LLC. She maintained a direct FFT account and used it to build and store dozens of courses central to her professional work. She received no individualized notice of the May export window, missed that window, demanded access, and was told on June 4, 2026, that no further retrieval window was then planned. Although Instructure announced a second and final window on July 10, Plaintiff still has not received a complete individualized export or confirmation that all of her courses would be accessible and exportable.

14. Farah continues to need and intends to use the affected courses in ongoing teaching, training, curriculum-design, and professional activities. Their arrangement, sequencing, assessments, feedback, metadata, and Canvas-native architecture cannot be perfectly replaced by money alone.

15. Instructure has publicly acknowledged unauthorized access involving fields such as usernames, email addresses, course names, enrollment information, and messages; an exploited vulnerability involving support tickets in the FFT environment; a second Canvas vulnerability used

by the same threat actor on May 7, 2026; and the permanent discontinuation of FFT. Instructure has also acknowledged disruption, missed classroom moments, unanswered questions, and inconsistent communications.

16. The defining Teacher/Educator Track injury is the months-long deprivation of specific user-owned content while Instructure retained exclusive or superior control over the FFT database, application server, credentials, and export tools. Instructure's July 10 announcement that the segregated FFT database and application server would again be opened for export supports the reasonable inference that at least substantial portions of the content remained preserved and technically retrievable after the first window closed.

17. The claims seek relief for completed loss of use and mitigation costs, together with narrowly tailored preservation, disclosure, and export relief. They do not depend on speculative identity theft, generalized anxiety, or institutional service-level damages.

## II. PARTIES

18. Plaintiff Farah L. Vallera is a citizen and resident of Pennsylvania and resides in Lehigh County, Pennsylvania. Dr. Vallera is a faculty member, instructional designer, curriculum writer, educational researcher, and Founder and CEO of Mindful Learning Design, LLC. As to the claims asserted in her individual capacity, Farah personally authored and owns, or otherwise has the immediate right to possess, the course content for which she seeks relief. She does not seek entity-owned damages in this pleading.

19. Farah maintained a direct FFT account and used it to build, maintain, and deliver dozens of identifiable courses and teacher-training modules. The content included original course organization, instructional sequencing, assessments, quiz banks, training materials, files, feedback,

and other digital assets. Instructure's account, course, and export records can identify the affected courses and their associated content.

20. At the time FFT was taken offline, Farah's account contained active course content. Instructure did not tell her that her account violated the Terms, exceeded storage limits, had been deleted for inactivity, or that her content had been destroyed. On information and belief, based in part on Instructure's ability to reopen the segregated FFT environment twice, her account records and at least substantial portions of her course content remain stored in systems, backups, snapshots, object storage, or archives under Instructure's control.

21. Defendant Instructure, Inc. is an education-technology company that owns, operates, markets, maintains, and controls the Canvas learning-management system and Canvas Free-for-Teacher. Instructure maintains its headquarters and principal Utah office in Salt Lake County, Utah, conducts business nationwide, and directed FFT services to educators nationwide, including Pennsylvania educators such as Farah.

22. The true names and capacities of Defendants Does 1 through 10 are presently unknown. Plaintiff will amend this Complaint if discovery identifies other Instructure affiliates, officers, employees, vendors, or entities responsible for FFT security, incident response, notice, shutdown, content retention, export, migration, or remediation decisions.

## III. JURISDICTION AND VENUE

23. This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the proposed Classes contain more than 100 members, at least one Class member is a citizen of a State different from Defendant, and the aggregate amount in controversy

exceeds $5,000,000, exclusive of interest and costs. Instructure publicly reported that FFT had supported approximately 76,000 teachers and 2.1 million courses worldwide. On information and belief, thousands of United States account holders stored educator-owned content in FFT, and the aggregate loss-of-use, recovery, rebuild, migration, substitute-platform, and professional-interruption damages associated with even a fraction of those courses exceed the jurisdictional threshold.

24. This Court may grant declaratory and injunctive relief under 28 U.S.C. Sections 2201 and 2202 and the Court's equitable authority. Those remedial statutes do not supply subject-matter jurisdiction by themselves; CAFA supplies jurisdiction over all claims asserted here, and the requested declaratory and injunctive relief arises from the same common nucleus of facts as the damages claims.

25. The Court has personal jurisdiction over Instructure because Instructure is headquartered in this District, conducts substantial business from Utah, and made, implemented, or controlled the FFT security, incident-response, notice, shutdown, content-retention, export, migration, and remediation decisions challenged here from or through its Utah operations. Instructure also purposefully directed FFT services nationwide, including to Farah in Pennsylvania, and Plaintiff's claims arise from or relate to those contacts.

26. Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) because Instructure resides here and a substantial part of the conduct and omissions giving rise to Plaintiff's claims - including corporate security, notice, shutdown, retention, export, migration, and remediation decisions - occurred in or were directed from this District. Venue is also appropriate

because related Instructure actions are consolidated in *In re Instructure Data Breach Litigation*, Case No. 2:26-cv-00374-RJS-CMR.

## IV. FACTUAL ALLEGATIONS

### A. Canvas Stores and Maintains Critical Teaching Infrastructure and Information

27. Instructure marketed and provided Canvas and FFT as learning-management systems through which educators could create accounts, organize courses, upload files, build assessments, communicate, and preserve reusable instructional content. Direct FFT users depended on Instructure's account controls, databases, and export tools to obtain complete Canvas-native copies of their courses.

28. For direct FFT users, reasonable security, preservation, exportability, and access to user-owned content were material functions of the service. Instructure knew educators would invest substantial labor in course structures and reusable digital assets and would suffer foreseeable property, professional, and economic harm if Instructure failed to safeguard those systems or created a recovery process that did not provide effective notice and a reasonable means of export.

29. Canvas associated course content with specific user accounts, course identifiers, files, database records, and exportable course packages. Instructure controlled authentication, the FFT database and application server, the availability of complete export functionality, and the logs showing whether an account holder successfully exported a course.

30. Instructure knew or should have known that direct account holders would rely on the account email address and ordinary platform access for material service and recovery notices,

and that passive publication of a short export deadline could deprive users of a meaningful opportunity to recover years of work.

**B. The Security Incident and Canvas Outage**

31. On or about April 29, 2026, Instructure detected unauthorized activity in the Canvas by Instructure environment. Instructure later stated that it revoked the unauthorized access, began an investigation, and engaged outside forensic experts.

32. Instructure stated that the incident involved data fields including usernames, email addresses, course names, enrollment information, and messages. The security incident precipitated the shutdown and because the same threat actor obtained additional access through a second vulnerability days later.

33. On or about May 7, 2026, the same threat actor gained additional access through a second Canvas vulnerability. Instructure publicly stated that the unauthorized actor changed pages that appeared when some students and teachers logged in through Canvas. Instructure then took Canvas offline into maintenance mode to contain activity, investigate, and apply additional safeguards.

34. Instructure's own public statements acknowledge that the incident created disruption, stress, missed classroom moments, unanswered questions, and inconsistent communication. For direct FFT educators, that disruption was compounded by the permanent shutdown of their account environment and their dependence on Instructure-controlled authentication and export tools to recover existing content.

35. Instructure's statement that certain categories of "core learning data" were not compromised does not resolve the claims here. The alleged injury is that Instructure itself deprived direct FFT users of access to content that remained associated with their accounts and controlled the only complete export process.

36. On information and belief, the same centralized security, incident-response, and executive teams controlled the first response, the May 7 shutdown, the decision to permanently discontinue FFT, the selection of notice channels, the duration of each recovery window, and the availability of support and individualized exports.

**C. Canvas Free-for-Teacher Was Taken Offline and Then Discontinued**

37. Instructure has stated that the unauthorized actor carried out activity using one of its Canvas Free-for-Teacher accounts and that, as a result, Canvas Free-for-Teacher was taken offline. Instructure then permanently discontinued the Free-for-Teacher program.

38. After Free-for-Teacher was taken offline, Instructure temporarily restored access in a limited capacity from 12:00 a.m. Eastern Time on May 28, 2026 through 11:59 p.m. Eastern Time on May 29, 2026 so educators could download course content and close out the school year. This window lasted only approximately 48 hours.

39. Instructure did not send Farah an individualized email announcing the May recovery window. In a May 26, 2026, public response, Instructure's Senior Director of Community stated that the company had held "many conversations about messaging every FFT user" but decided against emailing every user because of concerns about bounced messages and spam

filtering. Instructure instead relied on a blog, its website, and the FFT login page while allowing only approximately 48 hours to act.

40. Farah's account email was the direct channel through which Instructure could have given her timely, actionable notice. Had Instructure sent individualized notice sufficiently in advance of the May window, or provided a reasonably longer window after passive notice, Farah would have accessed the account and attempted to export her courses.

41. After Farah demanded return of her courses, Instructure support told her on June 4, 2026: "There is not another planned window to retrieve content from Free for Teacher at this time." Support acknowledged "how much work and care goes into your courses and content" but instructed her to monitor a blog. Instructure did not identify whether her courses remained in a database, backup, snapshot, object store, or archive; did not provide an individualized export; and did not give a concrete retrieval date.

42. On July 10, 2026, Instructure announced that it would reopen FFT one final time from 12:00 a.m. Eastern Time on July 28 through 11:59 p.m. Eastern Time on July 29. Instructure stated that users would be able to log in, view courses, and export materials, but that support functionality would remain off and that the FFT database and application server would remain segregated behind a dedicated firewall.

43. The post-window conduct is distinct from the initial emergency suspension. Plaintiff challenges the failure to provide an individualized return or export process during the period after the immediate emergency, the refusal or failure to disclose the status of her specific property, and the decision to leave complete recovery dependent on another unsupported two-day window.

44. The July announcement supports a plausible inference that Instructure retained the practical ability to restore access to the FFT environment and generate exports after June 4. It also confirms that the content-deprivation dispute concerns existing, controlled digital assets rather than content that Instructure had irretrievably destroyed.

**D. The July 2026 Final Window Does Not Cure Past or Ongoing Harm**

45. As of the filing of this Complaint, the July 28-29 window had not opened. Farah remains unable to access or use her courses and has not received a complete individualized export, a course-by-course content-status report, or confirmation that her specific account would authenticate successfully.

46. The announced window is again limited to approximately 48 hours and expressly disables support functionality. Users who encounter an authentication error, incomplete course list, corrupted export, missing linked file, or other technical problem have not been promised real-time support or a fallback individualized export.

47. Instructure has not represented that every affected account remains intact, that every course can be exported within the window, that all linked files and metadata will be included, or that it will provide an alternative if the export process fails. It has characterized the July window as the final opportunity.

48. Even a successful later export would not eliminate the loss of use from May until the export date, the professional time already spent searching for information and pursuing support, the costs already incurred to recreate or replace materials or other completed damages.

49. Farah faces a real and immediate risk of permanent or extended deprivation unless Instructure preserves her content, gives effective individualized notice, permits complete export, and provides a reasonable fallback process for technical failures. Those matters remain within Instructure's exclusive control.

50. Because Instructure can restore access to a segregated FFT database and application server, preservation, account-level disclosure, and individualized export relief are technically feasible and would redress the ongoing injury alleged here.

**E. Farah L. Vallera's Free-for-Teacher Educator Injuries**

51. Farah is an educator, instructional designer, curriculum writer, educational researcher, and founder and CEO of Mindful Learning Design, LLC. She personally created and arranged substantial portions of the course content at issue and continues to have an immediate professional need to possess and use it.

52. Farah used FFT to build, store, and deliver dozens of identifiable courses and curriculum assets. The affected property includes course shells, module sequences, assessments, quiz banks, files, links, HTML layouts, feedback, and account-linked metadata. The value lies not only in individual files but also in the Canvas-native organization and relationships among those components.

53. Farah received no direct email about the incident or the May recovery period. She did not see the passive announcement in time to act. The absence of individualized notice, combined with the exceptionally short deadline, deprived her of a meaningful opportunity to export years of work.

54. Farah did not knowingly abandon her courses, consent to their continued exclusive control after FFT ended, or authorize Instructure to condition return on the purchase of another product. She has consistently sought access and return.

55. Farah contacted Instructure support and expressly demanded access to her courses. Support did not provide access or an export and stated on June 4 that no other retrieval window was then planned. Her demand and Instructure's response establish an actual dispute over possession and access, not a hypothetical future loss.

56. Instructure did not provide a new recovery date until July 10, more than a month after the June 4 response and more than six weeks after the first window closed. During that interval, Farah remained deprived of the ability to use, update, deliver, migrate, or verify her courses.

57. After support failed to return her courses, Farah contacted Instructure sales in an effort to preserve her ability to deliver courses and trainings. An Instructure representative discussed a paid Canvas offering of approximately $5,000 per year for up to 200 students, plus an implementation fee later estimated at approximately $10,000. The sales discussion did not produce access to her existing FFT content.

58. The proposed paid service was not a substitute for return of existing property. Instructure did not promise that purchasing it would restore Farah's courses, and no paid migration was completed.

59. When Farah asked whether the implementation fee would include migration of her FFT courses, the Instructure representative responded: "I'm not certain the courses can be

migrated." The proposed paid service therefore did not assure restoration of the assets Instructure already hosted and controlled.

60. Farah has spent professional time locating announcements, contacting support and sales, documenting the problem, evaluating replacement systems, and attempting to reconstruct or preserve course materials. She has also lost the use of the courses during a period in which she needed them for professional work.

61. Farah's completed injuries include loss of access to dozens of identifiable courses; loss of use and control of business-critical instructional assets; professional time spent seeking recovery; reasonable rebuild and migration costs; substitute-platform and mitigation expenses; and interruption or delay in her ability to use the courses for teaching, training, and curriculum-design work.

62. Farah's time spent seeking recovery or rebuilding her course work is time she could and would have spent doing other things, like working on new course materials.

63. As of filing, Farah had not obtained a complete, usable export of the affected courses. Any later export will mitigate only those losses that have not already accrued and will not resolve claims concerning missing, incomplete, or corrupted content.

**E. Instructure Shifted the Incident Burden to Teachers and Educators**

64. Instead of sending each direct account holder timely individualized notice, maintaining a reasonable recovery period, and providing account-level support or exports, Instructure required educators to discover passive announcements, fit years of content recovery

into short windows, troubleshoot without support, chase multiple corporate channels, and absorb the cost of rebuilding or replacing materials.

65. Those burdens were foreseeable because Instructure controlled the account email addresses, authentication systems, databases, export tools, and support channels and knew that many FFT users had built substantial professional content over years.

66. Instructure first closed the May window and told Farah that no additional window was then planned. It later announced another final 48-hour window but kept support disabled and did not promise an individualized fallback. The later announcement does not eliminate the intervening deprivation or ensure complete return.

67. Instructure also created a migration problem. It permanently discontinued FFT, discussed a future enhanced product, and offered Farah a costly paid option without assuring that her existing FFT courses could be migrated. Meanwhile, Instructure retained superior control over any recoverable copies.

**G. Instructure's Terms Recognize User Ownership but Eliminate Any Practical Remedy**

68. The version of the FFT Terms currently published by Instructure, effective February 1, 2024, states that "Your Content is yours" and that the Terms give Instructure no rights in user content except limited rights needed to offer the Service, including hosting and backing it up. Plaintiff does not concede which version governed her account, whether or how she assented to that version, whether later revisions were adequately noticed, or the enforceability and scope of any liability cap, jury waiver, or class-action waiver.

69. The published Terms also reserve discretion to suspend or end the Service without notice and disclaim liability for loss or failure to store content. Plaintiff does not base her claims merely on ordinary service interruption, a promise of perpetual free service, or content that was irretrievably deleted. She alleges that Instructure continued to possess or control existing user-owned content after ending the Service but denied a meaningful means of return or export after demand.

70. No limitation or waiver warrants dismissal on the pleadings because Instructure has not established the governing version, assent, conspicuousness, or scope. In any event, the published provisions do not unambiguously authorize post-termination dominion over existing user-owned content, do not bar prospective preservation or return relief, and may not be enforceable as fully applied to intentional or reckless misconduct permitted by governing law.

71. Under Federal Rule of Civil Procedure 8(d), Plaintiff pleads contract, tort, property, and restitution theories in the alternative.

## V. TEACHER/EDUCATOR DISTINCT TRACK 3 DAMAGES AND INJURY

72. Plaintiff and Teacher/Educator Track 3 members suffered direct, non-duplicative injuries, including completed loss of use and control of educator-owned course content; reasonable replacement or reconstruction cost of course architecture and instructional assets; professional time necessarily spent seeking return, rebuilding, exporting, and migrating; unreimbursed substitute-platform, communication, and mitigation expenses; and interruption of independent teaching, training, consulting, or curriculum work. The Track excludes institutional contract damages, employer-paid salary, employer-owned content, and losses belonging solely to a separate entity.

73. The claimed injury is the deprivation and impairment of specific property, together with actual expenditures and professional time caused by the inability to possess and use that property.

74. These injuries are present and concrete. Farah was denied access to identifiable courses after demand, remained unable to use them for more than six weeks, and spent time and resources attempting recovery and evaluating or using alternatives. A later export cannot undo the completed loss-of-use period or costs already incurred.

75. The threatened injury supporting prospective relief is also concrete and imminent. The announced final window is short, support is disabled, and Instructure has not guaranteed that Farah's account will authenticate or that every course and linked asset will export completely. Only Instructure can preserve the records, disclose their status, and generate or facilitate a fallback export.

76. The notice failure is alleged as a causal mechanism for concrete loss, not as a free-standing procedural injury. Effective individualized notice would have allowed Farah and similarly situated direct account holders to use the May recovery process before the initial deadline and avoid or reduce the ensuing deprivation and mitigation costs.

77. Plaintiff and Educator Track members are entitled to damages, restitution, declaratory relief, injunctive relief, and all other relief available at law or equity.

## VI. CLASS ALLEGATIONS

78. Plaintiff brings this distinct and separate Teacher / Educator Track under Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), subject to amendment after discovery

concerning account status, historical terms and assent records, ownership, export logs, support requests, content-retention status, and the results of the July 28-29 window.

79. **Plaintiff proposes the following objectively defined Class, or such modified classes as the Court deems appropriate:**

> **Nationwide FFT Class**: All natural persons in the United States who maintained a Canvas Free-for-Teacher account between April 29, 2026 to present; at the time FFT was taken offline had course content or other work product uploaded or saved on their FFT account; did not obtain a complete export during the May 28-29 window; and remained unable to access or export all such content from May 30 through at least June 30, 2026.
>
> **Content-Return Subclass**: All members of the Nationwide FFT Class who, as of the time of class certification, remain unable to obtain a complete and usable export of all educator-owned content associated with their FFT accounts after demand or attempted use of the July 28-29 window.
>
> **Demand-and-Refusal Subclass**: All members of the Nationwide FFT Class who, after May 29, 2026, requested access, return, or export through Instructure support, sales, community, or another channel reasonably calculated to reach Instructure and did not receive a complete individualized export within a reasonable time.

80. Excluded from the Class are Defendant and its affiliates; judicial officers assigned to this action and their immediate families; schools, districts, colleges, universities, employers, and separate business entities seeking their own institutional or entity losses; persons asserting only student or parent claims; persons whose relevant content was fully exported without loss or unreimbursed cost; persons whose only claimed content was owned by an excluded entity; and persons who validly request exclusion from a Rule 23(b)(3) class.

81. Numerosity. Instructure publicly reported that FFT had supported approximately 76,000 teachers and 2.1 million courses worldwide. The number of United States users who missed the May window, did not complete export, or remained deprived through June is within

Instructure's account, email, authentication, export, support-ticket, and retention records and is sufficiently numerous that joinder is impracticable.

82. Ascertainability and Administrative Feasibility. Class membership can be determined through objective records, including direct-account status, course ownership attestations, account and course identifiers, email-send logs, login logs, export logs, support requests, and documentation of unreimbursed costs or loss of use.

83. Commonality. Common questions include which terms and sign-up interfaces applied; whether Instructure retained Class members' content after shutdown; whether the content was technically retrievable; whether individualized notice was feasible; whether the May and July recovery protocols were reasonable; whether post-emergency control after demand constituted breach of contract, bailment, conversion, trespass to chattels, negligence, or unjust enrichment; whether limitations and waivers were assented to and enforceable; and whether uniform preservation, disclosure, export, and fallback relief is appropriate.

84. Common proof includes Instructure's centralized security and incident-response records, FFT architecture, historical terms and interfaces, account and course databases, content-retention policies, email and web-notice decisions, authentication and export logs, support scripts, June responses, and July recovery protocol.

85. Typicality. Farah's claims are typical because she maintained a direct FFT educator account, personally owned or had the immediate right to possess identifiable course content, received no individualized May notice, missed the May window, demanded access, was not given an individualized export, suffered completed loss of use and recovery costs, and remains dependent on the same final unsupported recovery protocol challenged by the Classes.

86. Adequacy. Farah will fairly and adequately protect the interests of the proposed Classes. She seeks return and compensation only for personally owned or possessed content and direct, unreimbursed losses, and her interests are aligned with other direct FFT educators. Farah has retained counsel experienced in class, privacy, data breach, consumer-protection, and complex litigation.

87. Predominance. The central liability issues arise from common FFT architecture, centralized shutdown and notice decisions, uniform May and July recovery windows, common post-window support policies, common or identifiable term versions and interfaces, and centrally maintained accounts, content, notice, and export records. Individual differences in course counts and direct damages can be addressed through subclasses, records, declarations, and an objective claims process.

88. Damages can be calculated using common categories of proof, including the duration of deprivation, course counts, export status, documented reconstruction or migration time, substitute-platform costs, and proof of professional use, while excluding compensated, reimbursed, institutional, and duplicate losses.

89. Superiority. A class action is superior to individual actions because the cost of litigating ownership, content-status, notice, and export issues individually would exceed many educators' recoveries, while the same centralized conduct and records would otherwise be relitigated repeatedly.

90. Rule 23(b)(2). Instructure has acted or refused to act on grounds generally applicable to the Content-Return and Individualized-Notice Subclasses. Narrow declaratory and injunctive relief - including preservation, account-level content-status disclosure, effective direct

notice, complete export, and a reasonable fallback for failed exports - would apply to those subclasses as a whole.

## VII. CLAIMS FOR RELIEF

### COUNT I - NEGLIGENCE AND GROSS NEGLIGENCE
### (On Behalf of the Nationwide FFT Class and Subclasses)

91. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

92. Instructure owed Plaintiff and Class members duties of reasonable care independent of any promise to keep FFT perpetually available. Those duties arose from Instructure's custody and superior control of user-owned property, its affirmative collection and storage of account and course data on internet-accessible systems, its control of the only complete Canvas-native export mechanisms, and the common-law obligation to exercise reasonable care so as not to damage, lose, expose, or wrongfully impair another's property after accepting it for hosting and return.

93. The independent duties included using reasonable security to protect the systems necessary to access and export entrusted content; preserving identifiable content after an incident; avoiding unreasonable interference with an owner's possessory rights after the emergency; and exercising reasonable care when creating a short, time-sensitive recovery process on which the owners' ability to mitigate depended. These duties exist apart from any contractual service-level promise, and the claim is also pleaded in the alternative if no enforceable contract governs.

94. Instructure breached those duties by, among other things, failing to implement reasonable access controls, least-privilege restrictions, segmentation, monitoring, and timely remediation for the support-ticket vulnerability and privilege-escalation paths that Instructure itself acknowledged; failing to prevent the same actor from obtaining additional access through a second

vulnerability; failing to send effective individualized notice despite recognizing and discussing that option; imposing short recovery periods; disabling support during the announced final window; failing to disclose account-level content status; and failing to provide a reasonable individualized export or fallback after demand.

95. The breaches caused the alleged injury. Had Instructure used reasonable security, sent direct notice sufficiently in advance of the May window, or provided a reasonable supported recovery process after the emergency, Farah would have accessed and exported her courses earlier and avoided or reduced the completed loss of use, recovery time, rebuild costs, and substitute expenses.

96. Instructure's July announcement confirms that restoring segregated access and export functionality was technically possible. The delay between the May window and the July final window, and the continued absence of individualized support or fallback relief, were substantial factors in prolonging the deprivation.

97. As a direct and proximate result of Instructure's negligence, Plaintiff and Class members suffered actual property impairment, completed loss of use, reasonable recovery and reconstruction costs, professional time loss, substitute-platform expenses, and other direct injuries alleged herein.

98. Plaintiff does not seek institution-owned payroll, enterprise-contract, or IT damages under this Count and does not premise negligence solely on the termination of a free service. The Count targets independent custodial, property-protection, security, and recovery-process duties.

99. Instructure had actual knowledge that effective notice was critical. Its Senior Director of Community publicly acknowledged "many conversations" about emailing every FFT user, yet Instructure chose passive channels and paired them with an approximately 48-hour deadline affecting years of user-created content.

100. After users missed the first window, Instructure knew from support requests that direct account holders remained locked out of valuable content. It nevertheless told Farah no additional window was then planned, left her without account-level information for more than a month, and later announced another final 48-hour period with support functionality disabled.

101. The announced ability to reopen the segregated FFT database and application server made the probability of continued deprivation from inadequate notice, support, and export procedures known and avoidable. Instructure nevertheless failed to offer a reasonable individualized fallback for account or export failures.

102. These facts plausibly constitute an extreme departure from reasonable care and reckless indifference to a known and highly probable deprivation of user-owned professional assets. Plaintiff therefore alleges gross negligence, recklessness, and willful or wanton post-incident remediation as aggravated forms of the negligent conduct pleaded in this Count.

103. To the extent permitted by the law ultimately applied, Plaintiff seeks punitive or exemplary damages for reckless or willful conduct. No contractual limitation can be resolved in Instructure's favor on the pleadings absent proof of the governing terms, assent, scope, and enforceability.

104. Independently, Instructure voluntarily undertook to design and administer the sole post-shutdown recovery process, communicate the recovery deadlines, reopen the segregated FFT

environment, and enable users to export content. Having undertaken those protective measures, Instructure was required to perform them with reasonable care because negligent notice and export administration increased the risk of permanent deprivation and direct account holders depended on that process as their only practical means of recovery.

105. To the extent Pennsylvania law governs Farah's tort claim, Instructure's affirmative collection and storage of her account, communications, and course information on internet-accessible systems also gave rise to an independent common-law duty to use reasonable care in safeguarding that information and the systems required to access it.

106. The economic-loss doctrine does not bar this Count because Plaintiff alleges duties independent of the FFT Terms, actual impairment and loss of use of specific personal property, and alternative tort pleading while formation, assent, scope, and enforceability of any contract remain disputed.

107. The facts needed to identify the precise security controls, access privileges, internal warnings, root causes, account-retention status, and reasons for the recovery-protocol decisions are peculiarly within Instructure's possession. Plaintiff therefore alleges those matters on information and belief, supported by Instructure's admissions of an exploited FFT support-ticket vulnerability, a second vulnerability, privilege-escalation paths, and its ability to reopen the segregated environment.

108. The negligent-security allegations are not offered as a stand-alone theory of speculative data exposure. They are alleged because the exploited weaknesses precipitated the shutdown and because reasonable security and recovery administration would have avoided or materially shortened the deprivation of the specific content at issue.

## COUNT II - BREACH OF CONTRACT AND, IN THE ALTERNATIVE, BREACH OF IMPLIED-IN-FACT CONTRACT AND THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

**(On Behalf of the Nationwide FFT Class and Subclasses)**

109. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

110. To the extent an enforceable version of the FFT Terms governed, it formed an express contract between Instructure and direct FFT users. The currently published version recognizes that "Your Content is yours," gives Instructure only the limited permissions needed to offer the Service, including hosting and backup, and provides that provisions which by their nature should survive will survive termination. User ownership and the limits on Instructure's content permissions necessarily survive termination.

111. Farah performed and supplied consideration by creating and maintaining her account, complying with applicable use requirements, providing accurate account information, furnishing content and data, and granting the limited permissions necessary for Instructure to host and operate her content. She did not abandon the content or consent to post-termination exclusive control inconsistent with her ownership.

112. Instructure breached the express ownership and limited-license framework by continuing, after terminating FFT and after Farah demanded return, to exercise exclusive or superior control over existing user-owned content without providing a reasonable means for the owner to obtain a complete copy. Farah's demand also revoked any permission to retain or use the content beyond the limited period reasonably necessary to preserve and return it.

113. Plaintiff does not allege that the contract guaranteed uninterrupted service or perpetual storage. The reservation of a right to suspend or end FFT and the disclaimer for loss or

failure to store content do not expressly authorize Instructure to retain existing content indefinitely, conceal its status, refuse return after demand, or deny the owner a meaningful export while the content remains retrievable.

114. Alternatively, the contract contains a genuine gap concerning the disposition and return of existing user-owned content after Instructure permanently ends the Service for reasons unrelated to a user's breach. The implied covenant supplied the term the parties would have agreed to had they anticipated the issue: Instructure would not exercise termination and exclusive control over export in a manner that deprived the owner of the fruits of the ownership promise without effective notice and a reasonable opportunity to obtain the content.

115. If no enforceable express contract governed because Instructure cannot prove assent to the operative terms or a later revision, the parties' conduct created an implied-in-fact contract supported by consideration. Instructure invited educators to create direct accounts and deposit course content for hosting and access; educators accepted and conferred content, data, engagement, and platform value; and both sides manifested an understanding that the educators retained ownership and would be able to access or reasonably retrieve existing content.

116. The implied-in-fact contract and implied-covenant theories are pleaded only in the alternative and do not override an express term. They address post-termination treatment of existing content that Instructure continued to possess or control, a subject not unambiguously resolved by the published termination, inactivity-deletion, and storage provisions.

117. Instructure's breaches caused completed loss of use, recovery and reconstruction costs, substitute-platform expenses, and other direct damages. They also support specific

performance, preservation, accounting, and return or export relief because the affected course architecture and metadata are unique.

118. Plaintiff does not concede the enforceability or application of any liability cap, damages exclusion, jury waiver, or class-action waiver. Those defenses depend on facts concerning account creation, the sign-up interface, historical term versions, notice of revisions, assent, conspicuousness, scope, and severability that are within Instructure's possession and cannot be resolved against Plaintiff on the pleadings.

## COUNT III – BAILMENT
## (On Behalf of the Demand-and-Refusal and Content-Return Subclasses, in the Alternative)

119. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

120. Plaintiff and Class members delivered identifiable electronic property—including course packages, files, uploaded attachments, modules, assessments, quiz banks, course structures, and associated account records—to Instructure for the limited purpose of hosting, delivery, storage, and later access or export through FFT.

121. In return, Defendant received a benefit from the teacher's and educator's course materials and information. FFT users granted Defendant a broad, worldwide, royalty-free license to use, host, store, and modify uploaded content to operate and improve their products. They also used the FFT user's intellectual property and data licensing to test their products and collect data. The FFT users acted as live testbeds for new system features, providing valuable user engagement data and telemetry to optimize the broader Canvas ecosystem. To date, Defendant still uses the course materials and information Plaintiff and the Class Members uploaded to Canvas to test its platforms, collect information, and improve its products.

122. Instructure accepted that property, associated it with specific user and course identifiers, stored it in systems under Instructure's control, and provided account and export mechanisms through which the owners could ordinarily retrieve it. After FFT was disabled, Instructure alone controlled complete access to those systems and mechanisms.

123. Instructure therefore had exclusive or superior possession and custody of the complete Canvas-native course packages and the databases, credentials, and export tools necessary to return them. The owners retained title and an immediate right to possession of their own content.

124. A bailment arose from delivery and acceptance for this limited purpose. At minimum, Instructure was required to exercise reasonable care over the bailed property, preserve it during the incident response, and return it or make it reasonably available on demand when the hosting relationship ended, subject to lawful security measures.

125. Plaintiff has alleged delivery, acceptance, continued control, demand, and failure to return. Instructure's announcement that it can reopen the segregated FFT environment supports the inference that the bailed property, or recoverable copies of it, remains within Instructure's custody.

126. Instructure breached its duties as bailee by failing to use reasonable care in protecting the access environment, failing to provide effective notice of the May recovery period, withholding account-level content information, failing to return or export Farah's property after demand, and leaving final recovery dependent on another brief unsupported window.

127. The bailment did not authorize indefinite retention or exclusive control after service termination. Nor did it authorize Instructure to leave the owner without a reasonable return mechanism when return remained technically possible.

128. As a direct result, Farah and Class members suffered completed loss of use, impairment of the property's availability and value, recovery and rebuild costs, substitute-platform expenses, and other direct damages. Plaintiff also seeks return, accounting, and preservation of the bailed property.

**COUNT IV - CONVERSION**
**(On Behalf of the Demand-and-Refusal and Content-Return Subclasses, in the Alternative)**

129. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

130. The property at issue consists of specific, identifiable, segregable, and exportable electronic records and files - including account-linked course packages, uploaded files, module structures, assessments, quiz banks, metadata, and database records - capable of possession, control, transfer, return, and valuation. The claim does not seek conversion of abstract ideas or a generalized copyright interest.

131. Farah and Class members owned, or had an immediate superior right to possess, their own content. Instructure's published Terms expressly recognize user ownership, and termination of FFT ended any need to withhold the owners' access to existing content solely for ordinary service operation.

132. Instructure's initial possession was consensual. The conversion arose or continued after the immediate emergency, when Farah demanded access and Instructure intentionally maintained exclusive dominion over her identifiable content, did not disclose its status, did not provide an individualized export, and denied her the present ability to possess and use it.

133. The July 10 announcement that Instructure could reopen the segregated FFT database and application server supports the inference that Instructure retained practical control

over recoverable content throughout the deprivation period. A later limited opportunity to export does not retroactively authorize the prior dominion or eliminate completed loss-of-use damages.

134. Farah made a clear demand. Instructure did not return the content and stated on June 4 that no other window was then planned. The later final window remains unsupported and does not guarantee complete return; conversion or wrongful dominion therefore continues as to any content not completely and successfully exported.

135. This Count contains the extra elements of possession, immediate right to possession, demand, and wrongful dominion over specific electronic records. It is not based on unauthorized reproduction, distribution, or other rights equivalent to copyright.

136. Instructure's conduct caused actual damages, including completed loss of use, diminution or impairment of availability, reasonable recovery and replacement costs, professional time, substitute-platform expenses, and the cost to recreate missing or unusable portions of course content. Plaintiff also seeks return or the value of property that cannot be returned.

**COUNT V - TRESPASS TO CHATTELS**
**(On Behalf of the Demand-and-Refusal and Content-Return Subclasses, in the Alternative)**

137. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

138. Even if Instructure's interference did not amount to complete conversion, it intentionally and substantially interfered with Plaintiff's and Class members' possessory use of identifiable electronic chattels by disabling access, retaining exclusive control after demand, withholding account-level status and export, and making recovery depend on brief unsupported windows.

139. The interference deprived Farah of the ability to view, use, update, deliver, verify, export, or migrate the affected courses for a substantial period and impaired the property's practical availability and professional value.

140. Plaintiff suffered actual impairment, loss of use, rebuild costs, substitute-platform costs, and business interruption as a direct result.

141. The information stored on the Canvas FFT platform is tangible property akin to a website. It consists of actual written lesson plans, course materials, quizzes, data, and other work-product created by the individual FFT users.

142. Those losses are actual even if Instructure later returns some or all content. Temporary but substantial deprivation, incomplete exports, missing linked files, corrupted course packages, and necessary reconstruction each cause compensable impairment.

143. This Count is pleaded in the alternative to conversion and contract. Plaintiff seeks only the relief available under the law determined to govern and no double recovery.

**COUNT VI - UNJUST ENRICHMENT AND RESTITUTION**
**(On Behalf of the Nationwide FFT Class and Subclasses, in the Alternative)**

144. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

145. This Count is pleaded only if no enforceable contract governs the challenged retention, return, and export conduct or if the contract does not provide an adequate remedy for the benefit unjustly retained.

146. Plaintiff and Class members conferred benefits on Instructure by creating and hosting substantial course content in FFT, providing account and usage data, increasing educator adoption and engagement, and contributing goodwill and platform value. Instructure publicly used

the scale of FFT—approximately 76,000 teachers and 2.1 million courses—to promote the program's success and value. Instructure knew of, accepted, and appreciated those benefits.

147. After permanently discontinuing FFT, Instructure retained superior control over the content and any recoverable copies while avoiding the cost of timely individualized notice, account-level disclosure, supported export, and reasonable return. It shifted recovery and reconstruction costs to the owners and contemporaneously discussed paid offerings that did not assure migration.

148. Plaintiff was correspondingly impoverished through loss of use, professional time, recovery costs, rebuild and migration expense, and substitute-platform costs directly related to the same content and account relationship from which Instructure received benefits.

149. There is a direct relationship between the benefit and impoverishment: Instructure retained content, engagement value, control, and avoided return costs while the owners were denied use and forced to bear the cost of recovery or replacement.

150. If no contract authorized that result, retention of those benefits without providing reasonable return, export, or restitution would be unjust and without adequate justification.

151. To the extent legal damages and return relief are unavailable or inadequate, Plaintiff and Class members lack an adequate remedy at law for the value of benefits unjustly retained and costs wrongfully shifted.

152. Plaintiff seeks restitution measured by the value of benefits attributable to Class members, disgorgement of unjustly retained benefits to the extent permitted, and other nonduplicative equitable relief.

**COUNT VII - DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**
**(On Behalf of the Content-Return and Individualized-Notice Subclasses Under Rule 23(b)(2))**

153. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

154. An actual controversy exists concerning ownership and the immediate right to possess FFT content; whether Farah's and Class members' content remains preserved and exportable; whether Instructure may retain exclusive control after ending the Service and after demand; the scope and enforceability of any purported limitations or waivers; and Instructure's obligation to provide a complete and reasonable return process.

155. Plaintiff seeks narrowly tailored relief requiring Instructure to preserve all FFT course content, databases, backups, snapshots, object storage, account metadata, authentication logs, export logs, and deletion logs; send effective individualized notice of any recovery deadline to each account email; disclose whether each affected account's content exists and can be exported; provide a complete and usable export; and provide a reasonable individualized fallback if authentication or export fails during the final window.

156. Plaintiff also seeks an order prohibiting Instructure from conditioning return of user-owned content on purchase of a paid Canvas product and requiring accurate communications about whether existing FFT courses can be recovered or migrated.

157. The need for prospective relief is concrete and imminent because, as of filing, Farah still lacked a complete export, the final window had not opened, support was disabled, and Instructure had not promised any fallback. The threatened loss is redressable through preservation, notice, disclosure, and export orders.

158. Money damages are inadequate because unique course architecture, metadata, assessments, feedback, and account relationships cannot be perfectly reconstructed and because only Instructure can determine what remains in its systems and generate a complete Canvas-native export.

159. The requested relief is technically feasible, as demonstrated by Instructure's ability to preserve and reopen the segregated FFT database and application server. Plaintiff does not seek generalized judicial supervision of Canvas security untethered to the concrete content-return controversy.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the proposed Educator Track Classes and Subclasses, respectfully requests that the Court enter judgment in her favor and against Instructure as follows:

a. certifying the proposed Classes and Subclasses, appointing Farah as class representative, and appointing Plaintiff's counsel as class counsel;

b. awarding actual, direct, compensatory, nominal, loss-of-use, replacement, reconstruction, migration, and other damages available at law, together with punitive or exemplary damages where authorized;

c. awarding nonduplicative restitution, disgorgement, and equitable monetary relief to the extent permitted;

d. declaring the parties' rights concerning ownership, possession, retention, export, return, and the scope and enforceability of the challenged Terms and waivers;

e. ordering preservation, account-level disclosure, effective individualized notice, complete export or return of recoverable FFT content, a reasonable fallback for failed authentication or export, transparent remediation, and a prohibition against conditioning return of user-owned content on purchase of a paid product;

f. ordering specific performance, mandatory injunctive relief, accounting, and such other property-return relief as is necessary to restore access to identifiable educator-owned content;

g. awarding pre-judgment and post-judgment interest;

h. awarding attorneys' fees, litigation expenses, and costs as permitted by law;

i. granting leave to amend as discovery reveals additional facts, entities, claims, subclasses, or remedies; and

j. awarding such other and further relief as the Court deems just and proper.

**X. JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: July 12, 2026

Respectfully submitted,

**PARSONS BEHLE & LATIMER**

By: /s/ *Charles H. Thronson*
Charles H. Thronson
201 South Main Street, Ste. 1800
Salt Lake City, Utah 84111
Tel: 801-532-1234
CThronson@parsonbehle.com

William B. Federman (*pro hac vice* forthcoming)
Jessica A. Wilkes (*pro hac vice* forthcoming)
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Tel: (405) 235-1560
wbf@federmanlaw.com
jaw@federmanlaw.com

Nicholas Andrew Hall (*pro hac vice* forthcoming)
**Hall Attorneys, PC**
P.O. Box 1370
Edna, Texas 77957
Telephone: (713) 428-8967
nhall@hallattorneys.com

*Attorneys for Plaintiff and the Proposed Teacher/Educator Track Classes*